Ms. Hartzler. May it please the Court. Good morning. Kara Hartzler on behalf of Mr. Bernal-Sanchez. This case presents an important issue of first impression. Can a litigant use a court subpoena to obtain documents before trial without judicial oversight? The answer is no. Such a practice would violate Federal Rule of Criminal Procedure 17, circumvent the Nixon factors, and permit sensitive information from unsuspecting third parties. What about the local rule? Your Honor, the local rule in my reading is pretty much the same as the Nixon factors. Well, it's pretty unambiguous, it seems to me. So maybe I could, for the sake of both of you, I'll just tell you that I'm concerned that there's some circuit of authority that suggests that Federal Rule 17 is capacious and subject to different application locally, but I don't know that the local rule applicable in this case is ambiguous. And so I'm not — I'd just like to hear both of your feedback about what do we do about that. Yes, Your Honor. If the — Your Honor is referring to the Sixth Circuit, I would point out that the Sixth Circuit specifically said it was not issuing a holding on this. So it's not — this Court would not be — Sixth and D.C. Correct, Your Honor. And then — Sorry, so do you read those differently, or do you think they both say essentially the same thing? I think the Sixth Circuit basically said, we're not really deciding this issue, we can see both sides of it. I think the District Court decision in Vaux definitely came out on our side. And then turning to the local rule that Your Honor's asking about, I think — I don't want to make the government's argument for them, but what they're saying is that the local rule says that no subpoena in a criminal case may require the production. And so the government's argument is, well, this is voluntary. I just wanted your response. My take on that. Yes, thank you. Sure. Two responses, Your Honor. First of all, I'm not sure that it was voluntary. It's really hard to know, for instance, in this case or any other, the intimidating and the coercive power of a subpoena to a person who's not used to being served with something like that from a federal agent. So we don't actually have any evidence here showing that this was voluntary. But even assuming it was, let's assume it was, that's actually beside the point. Because the point is that both federal rule of Criminal Procedure 17 and the Nixon factors clearly contemplate and clearly say, even in the plain language, we would argue, that these are not documents that can be obtained before court without some sort of judicial approval. Parties need to submit an application. And that's what happens in most cases. You do an application for a subpoena. You say, these are the reasons I need these particular documents. This is a narrow, reasonable request. They're relevant. They're specific. They're admissible. And that's exactly what did not happen here. So that's our real issue here, is that there can't be this huge loophole that the government is claiming there is. If there were, it would completely allow any party, anywhere, to just take court documents and issue them at will. Right. So what if we decided the rule was misused, but we haven't heard any articulation of an objection that could have been made, a colorable one, that would have prevented the production? Or if we think that the conviction was amply supported without these documents? So going to your first question, Your Honor, I think there's two ways that this court could decide the legal issue. And then I'll move to prejudice. So first of all, we think that there is a general rule under the Nixon Factors and Rule 17 that Rule 17c1 requires court approval in advance. But if the court doesn't want to issue any kind of general rule, I think all it would need to do is say, the government's attachment A here, which is at ER 430, at a minimum, that did not comply with Rule 17. I don't think you're getting at my question. I'm giving you that. If I find that 17 was right, had it been complied with, there would have been an opportunity to object. But I haven't heard a viable objection from your client about this particular request. Maybe that it was too many years, too capacious a scope. So we certainly made that in our motion to quash. But let me, and I apologize, I'll move to that, Your Honor. Please. The correct path for this court to take is not to apply the Nixon Factors in the first instance here to determine prejudice. And the reason for that is that there's a lot of very specific factual issues we could get into about the admissibility of these documents, which documents are allowed. What if we decide, counsel, what if we decide that these documents weren't needed at all for this conviction? I mean, there are two different agents. What if we just looked at, is it Crossian, that person's testimony, standing alone? So the reason that there's overall prejudice, I think, from these employment records coming in, which is, am I getting that right? That's my question. That's your question. I apologize. So the reason that this is prejudicial overall with the employment records is this. This is a slightly different fact pattern than you often see in a 1325 illegal entry case. And the reason is because Mr. Bernal Sanchez had been living in the United States for years with a work permit. That work permit didn't allow him to leave the country and re-enter. We don't have any evidence in the record that anyone saw him leaving, that anyone saw him coming back. All we know from the evidence is that he was found in a vacant lot about 140 yards north of the border. Well, we know more than that. We know that it was 3 a.m. We know that, at least according to the officers, he gave conflicting stories about why he was there, including initially saying he didn't know why he was there, that he had a car, but he didn't have car keys. You know the record very well, obviously. So what about all that circumstantial evidence? Your Honor, the employment records were the most damaging evidence because what they showed is that they showed that Mr. Bernal Sanchez was not working for the period prior to his arrest, and they also had information showing that he, suggesting that he went to Mexico for his mother's funeral. There's the work authorization, the form, I won't remember the number of the work authorization, where he admitted that his most recent entry was I think January 17th, you know, that day, and then there's the statements that he made to the officer, Crossian I think is his name, you know, at the time. Was that sufficient? Or in other words, does that make the... My question is why isn't that sufficient? It's not sufficient because the key thing that we were arguing at trial is how did he come in? Did he sneak through a port of entry or did he climb over the fence? Well, the port of entry was closed. It wasn't going to open until 5 in the morning. Well, that also goes to evidence that went to our second issue of discovery and the agent's testimony who was also a member of this Facebook group. So I'm happy to talk about that, but we also think that that's an issue. Okay. So I will just say we do think there's prejudice here. That was not enough because it didn't establish the means by which he entered, and that was the primary issue at trial. We also think that at a minimum, the government should have given us the discovery on the Facebook 1015 group, and our best case for that is Munez-Jacquez, which the government has never responded to. And unless the court has further questions, I'll save the remainder of my time. Okay. Thank you. Thank you, counsel. Good morning. May it please the court. Benjamin Hawley for the United States. So starting with that last point about prejudice, the court obviously knows the facts here, but the employment records were essentially, and the testimony of the HR manager, was to prove up that Mr. Bernal was lying when he told the agent he had a work truck, he was there for work. Even if none of that came in, even if that was entirely excluded, there was still sufficient evidence that he had entered illegally and had not done so through... There might be. Could you go back to the top of the decision tree, though? What about Rule 17? Is this the government's routine practice? I don't know. I don't know the extent of... I think, yes, to answer your question, it is relatively routine in terms of absolute numbers or percentage. I don't have any information. It absolutely shouldn't be routine if you go by the language of Rule 17C1. So the distinction that we have drawn is between mandatory and optional or non-mandatory. Both Rule 17A and C1, also the local rule, talk about when documents or testimony is required or is mandated. That part does not require pre-approval. What about the local rule? The local rule also uses the word require. If you're requiring documents to come... This is the government's... I'm really surprised that I didn't hear a concession that this was a mistake. Give me your best shot. My best shot is that the form and the rule and the local rule all talk about requirement. If you're requiring someone to come to court, that part doesn't require pre-approval. The problem here is even worse, though, because what the government subpoenaed is employment records, which typically have private, you know, there's private interest at stake. And logically, the request is somewhat overbroad for what the government wanted. You agree with that? You're nodding your head. It's overbroad. I agree it was very broad. And intrusive, and there was no opportunity to object, given the ambiguity of the language and the attachment. So I guess two responses to that. The first is that the way all of this came up wasn't the government kind of affirmatively going out and seeking these employment records. We were ready for trial on the morning of trial. We received reciprocal discovery. That is just a printout that essentially this company exists, has a website, and then trial gets continued. We don't know what the... The trial continued? I'm sorry? How long was the trial continued? It was a few... I believe it was four weeks. There were two continuances. Is the implied argument here that the government didn't have a chance, an opportunity, you know, time-wise, to comply with Rule 17? No, no. I'm sorry. That's not the argument. The argument was the reason we issued the subpoena and go to this business at all is because the defense apparently thought, you know, there was something relevant. So that's why you wanted the information. I understand why you wanted the information. I'm trying to figure out why you didn't comply with the rule to get it. I guess our argument would be that we did comply because we did not require pretrial production. Oh, you did. At least, ambiguously, you did. And, in fact, there was pretrial production. There was pretrial production, but I guess then moving to prejudice... The government didn't do anything... No, we're not done with you yet. We're not going to move to prejudice yet. Sorry. At least you were in the middle of responding to Judge Wardlaw's question, I think. So our argument is that if you require pretrial production, it does require that you have to go through the court. It did not require pretrial production. We served the subpoena. The business provides the records. There's no evidence of coercion or raised voices or anything that the agents were acting improperly in any way. All right. Suppose we disagree with you on that. Tell me why this wasn't prejudicial. So for a few reasons. The first is, if we're only talking about the records, we still have the HR manager's testimony about he wasn't issued a work truck, he wasn't working during that time. But first, what's the standard for admission? I mean, what's the standard for prejudice here? I believe that it's more likely than not that it did not affect the verdict. Whether the error influenced the fact finder's decision? I mean, even in that standard, if we take that out, we still have more than enough that And as counsel correctly indicated, the primary issue at trial wasn't that was he there for work or had he not just entered. It was did he come through the port of entry or did he jump the fence? And there, again, we have even knocking out all of... Didn't the magistrate in finding Bernal Sanchez guilty rely on substantially, heavily, on the information from the employment records? She certainly mentioned it as demonstrating that he was lying, but I don't think it was a but-for or a critical or even a necessary part of the decision. Again, taking that out, there's still sufficient evidence that he not only entered illegally, but did so not through the port of entry. And it was essentially the facts that Judge Christin had mentioned, that it's three o'clock in the morning, he gives multiple stories, he doesn't know why he's there, then he's doesn't have keys, can't identify where it is, can't even say what type of truck it is, admits that he is there illegally, and then in paperwork filed while this case was pending, but obviously after that, agrees that his last entry was without status in California on the date of the offense. None of that relies on the challenged information, and in the government's view, that's sufficient to find guilt beyond a reasonable doubt. So I'm going to take you back to Rule 17. Yes. Because the explanation you're giving today is not the basis for the district court's ruling, right? What the district court decided was that the witness from, is it 2020 Plumbing? 2020 Plumbing, yes. That she showed up and brought the document to trial anyway, and I think in fairness, I think the government's attorney, whoever was present at the trial, said, well, no. What she brought was sort of an additional batch, right?  Yes with a caveat. Okay. So there wasn't kind of a line-by-line distinction of what was provided pre-trial and brought it at trial, so there's some ambiguity in that regard, but yes, she brought a large stack with her, and then some additional information that hadn't been. Right. So you're anticipating my next question is, can I tell from this record what was produced ahead of time and what she brought that day? No. I'm sorry? No. Okay. Thank you. Again, because there was not kind of that accounting. That said, there was never any indication that something showed up that morning that the government used or that was a surprise to anybody. What we had received pre-trial was turned over in discovery. What was received that morning was obviously given to the defense as well, and there was never an objection that, you know, this is late or this is surprising or new. Counsel, I'm interested in the government's position on whether or not it was necessary or even in hindsight, should the government have looked through or run this, that one testifying officer's agents named through the Facebook, the saved Facebook account to see whether he had participated? So in hindsight, I think it would have just been easier to have done that and avoid the issue entirely. That said, that's what the Hinthorn process is supposed to catch. If he was being investigated or certainly if there's a finding. So Hinthorn's looking at his personnel file, and I think it's clear that that happened here. They looked at the personnel file. It wasn't in the personnel file. What I'm asking is, in hindsight, whether the government's position is that in order to comply with Brady, for example, and look for impeachment material, the government had an obligation to run that name through the, you know, the Facebook, the saved Facebook account. Right. No, because of the specifics in this situation where the court's understanding of the government's as well was anyone being investigated with that Facebook group, that was in their Hinthorn file. Right. Wait a minute. Wait a minute. The investigation wasn't done yet, right? It wasn't finished, was it? The investigation wasn't finished, but anyone being investigated, that immediately went to the file. So, in other words... There in the record, does it show that all 9,500 agents who were members of the I'm 1015 Facebook group had their activity logged into their personnel file? I don't know the total extent. My understanding from the record and the court's understanding at the time was if there was something derogatory or even an investigation pending, that would show up in the Hinthorn file or in the Hinthorn response. But we must have had a reason for thinking that, that the investigation was completed. That was our understanding. I'm guessing that... Is there something in the record that substantiates that representation, that it would have been in his personnel file? Both the parties said that that was the case, and the court said based on that and the public reports, which public reports... Where in the record is that express understanding that the representation made that it would have been? Is there anything substantiating it other than council representation? I don't believe so. This was just argued by proffer essentially in court, both parties and the court. So there wasn't extra documentation, I guess. I'm concerned because as your counsel on the other side indicated, that kind of... And the part that Agent Monroy testified to is that the port of entry didn't open or wasn't open at that time. He's also the one that found the rope or kind of rope ladder coming over the fence. In the government's view, again, even taking that part out, there's still sufficient evidence given where Mr. Bernal was found, his admissions at the time, and kind of the circumstances. Tracy also testified to the white dangling rope over the limb. Yes. I think that the only thing that is unique to Agent Monroy was the time the border opened. Correct. I think that's true, yes. And so even if that is taken out, you would have to then believe that Mr. Bernal came through, snuck through, somehow got through the port of entry, and then parallel defense as opposed to just... Right. So could you go back to the Brady obligation? Because there's a representation... The presumption is that government has to look. Right. And I don't hear you arguing, but I want to make sure I'm understanding correctly, this saved Facebook account was in possession of... The Border Patrol had it? It was not the prosecution. I don't know which agency might... I think it was DHS, broadly, which of course they're part of. But you know what I'm getting at? Yes, yes. You're not contesting that it was within the scope of where you would have to look, right? I think that's right, yes. Okay. So the question is, the government, I don't mean to personalize this because I don't know who made the representation, but my understanding is the government decided not to go look there, not because it was beyond the scope, but because it understood that those names had been looked at and if Agent Monroy had been participating in that, that there would be something in his personnel file. What we have in our record indicates that that investigation hadn't been completed yet. So it would be the government's burden, wouldn't it, to show a reason why they didn't need to go look? Yes. It was both the Hinthorn, but also he submitted a declaration saying, all I did was look at it, I didn't post, like, comment, it was purely job search-related activities. If that was false, as counsel points out, then that would be impeachment. But there was no reason to believe that was untrue or that was false, that was purely speculation at that point. But go back to the Hinthorn, because Hinthorn, you look at the personnel file, you would satisfy yourself that there wasn't anything in the personnel file, but the record we have, which I think all three of us now have circled back to, indicates that that process wasn't completed yet, sir. So it seems to me it's the government's burden to show a reason to not go look. And our reason would be that there's no indication he had done any of those things based on his declaration, anything that would be problematic. And obviously if this Court disagrees, that's when we move to the prejudice, and I've made that argument. Thank you. Here it's impossible to evaluate prejudice, because we don't know what, if anything, could have been in the Facebook. It's not in the sense that that was with Agent Monroy, and he had a limited, he added a limited amount to the testimony. So we can't tell, in other words, if I'm understanding your argument correctly, we can't tell the extent to which Agent Monroy may have been impeached. Your position is you don't need Agent Monroy to sustain this conviction. Yes, that's correct. So even, not only if his credibility was... The employment records and you don't need Monroy. So the whole conviction stands or falls with what begins with a C. Right. With the arresting agent and Mr. Bernal's admissions and kind of the context, plus his later application indicating that he didn't have status when he entered on the date of the offense. All right. Thank you, Counsel. Thank you. Thank you. I'd like to focus on prejudice, because that seems to be something the Court is very interested in. And we would agree with some of the points that have been made. First of all, the magistrate judge relied specifically on the employment records, on the other points we've made. But I want to add two important things. First of all, obviously, the government has the burden here to prove prejudice. They haven't done that. But the other aspect that I want to just point out that hasn't yet been discussed is that when these employment records came in, the prosecutor used them to essentially threaten Mr. Bernal Sanchez with potential charges of perjury. Those employment records also potentially opened Mr. Bernal Sanchez up to further criminal liability. But, Counsel, the problem with that is, and I'm concerned, of course, whether his right to testify was chilled, but how in the world was he going to testify having submitted that form, the work authorization form, indicating that he entered, you know, most recently on January 17th? It had nothing to do with the discovery violations that you're mentioning. I think, Your Honor— It just seems like it really puts him in a hard spot to make this argument. I think, Your Honor, the big picture here is that given all of these concerns, we don't know what would have happened. We don't know if he would have testified, what would have been said. And when the burden is the government's, they can't meet that. And that, if the Court has no further questions, we'll submit. All right. Thank you very much. Thank you, Your Honor. Thank you both. United States v. Bernal Sanchez is submitted.
judges: WARDLAW, CHRISTEN, SUNG